### Reynolds Brothers, et al. v. Moody.

(Decided June 23, 1922.)

### Appeal from McCracken Circuit Court.

Appeal and Error—Settlement.—In a settlement suit where the plaintiff claimed that the defendants owed him something more than $1,100.00, including two notes for $250.00 each, and there was

a written contract showing that the indebtedness was less than the amount claimed by the plaintiff by $500.00, and the great weight of the oral testimony supports this showing, the court erroneously found for the plaintiff the whole amount of the indebtedness.

W. M. HUSBANDS and MOCQUOT, BERRY & REED for appellants.

EATON & BOYD for appellee.

Opinion of the Court by Judge Sampson—Reversing.

This action was brought in the McCracken circuit court by appellee Moody to recover of Reynolds Brothers $1,159.76, which he claimed was due him from the defendants as the balance on the purchase price of one Gram-Bernstein motor truck, sold by him to them in February, 1918, and on which they paid at the time $500.00 cash, and executed a number of notes payable monthly for the balance of the purchase price. The original price of the truck was $4,555.19; this included items for insurance and other incidental matters. About May 1st, it was discovered by the parties to the transaction that Reynolds Brothers (colored men) would be unable to meet their regular monthly notes, and a new written contract was entered into whereby the monthly payments were reduced and a new series of notes executed and delivered to the agent of the plaintiff. However, this transaction was not carried out and the notes were retained by Moody. About this time the parties entered into a third written contract and executed a third series of notes of date May 1, 1918, which were supposed to and did, as appellants contend, cover and include all the indebtedness which Reynolds Brothers owed Moody on the truck. By that contract it was recited that Reynolds Brothers had paid on the truck something more than $1,300.00, and that they yet owed to Moody $3,223.01, and this last sum was divided into twelve installments, represented by notes, eleven of which were for the sum of $268.58, and the last one for $268.63. At the time of the making of this contract there was a payment made but the exact amount of this payment is in controversy. The plaintiff insists that he received only $300.00 cash at that time, while the defendants say they paid $800.00, and explain how and where they got the money with which to make the said payment. Some time later there was a fourth contract

made, dated December 18, 1918, and was accompanied by a series of new notes. It is claimed by the defendants, who kept no books of any consequence, that several of the notes executed and delivered by them with the first two or three contracts made with Moody were never surrendered by Moody to them upon the execution of the new notes which were to take their places. This in part is admitted by Moody. Moody insisted, however, that before May 1st, or perhaps a little bit later, he desired to discount the notes of Reynolds Brothers held by him with banks so as to use the money as operating capital, but he was unable to do so because the banking institutions would not at that time accept such paper unless the purchaser of such motor car had paid at least twenty-five per cent on the sale price. So, to circumvent this difficulty, Moody says he sent his agent Philmon to Eddyville, Kentucky, to make a settlement with Reynolds Brothers and to obtain notes which he could discount. The plan adopted by Philmon, as Moody contends, was to have a new contract showing that as much as twenty-five per cent had ben paid upon the truck, and the amount then due was only $3,223.01, and in pursuance to the plan Moody contends that they obtained from the colored men $300.00 in cash and two notes for $250.00 each, making $800.00, and then drew a contract showing that Reynolds Brothers owed only $3,223.01, and had paid something more than $1,300.00; that Moody took the two notes for $250.00 each without security in order to get the balance of the paper in bankable condition. It will, therefore, be seen that the sole controversy here is about the two notes of $250.00 each, for the defendants admit that they owe a balance, according to the contract of December 18, 1918, of $1,177.00, less the $500.00 represented by the two notes, and defendants offer to pay this sum. If the two notes came about in the way stated by Moody, then the defendants should pay them; but, if they are some of the old notes which Moody refused to surrender although he obtained new notes in their place, as contended by defendants, then this case must be reversed, for the lower court entered a judgment in favor of Moody for the full amount for which he sued.

Defendants admitted that they signed the two notes in suit, but they say they belonged to a series of notes of date May 1, 1918, which should have been but were not surrendered by Moody and fraudulently held by him al-

though he promised to surrender them. The controversy, therefore, resolves itself into a question of whether the two notes of $250.00 each, the balance of plaintiff's claim being admitted, have been paid in cash or liquidated by new notes of the same or subsequent date.

Plaintiff contends and testified that before May 1, 1918, he was unable to discount the notes of Reynolds Brothers because the banks would not accept paper of that kind unless and until at least twenty-five per cent of the sale price of the truck had been paid by the purchaser, and Reynolds Brothers having paid less than twenty-five per cent on the truck plaintiff had to carry the paper, the proceeds of which he needed in his business. To avoid this and to enable him to discount the notes plaintiff says he entered into the contract of May 1, 1918, which recites that defendants have paid $1,300.00 and only owed $3,200.00 on the truck, and took only twelve lien notes of $268.00 and some cents each, to conform to said contract, and on the side took two more notes of $250.00 each to cover the $500.00, which plaintiff says was necessary to make up the full balance due him for the truck. All this is denied by defendants, who say there was no indebtedness at that time save that represented by the twelve said notes; that the twelve notes aggregating $3,223.01 including the open account. In this they are sustained by the written contract made between the parties on that date which says in substance that defendants had then paid $1,332.18, and only owed $3,223.01, represented by notes. The contract, which is a long and involved one, reads in part as follows:

"That seller in consideration of the payments, covenants, agreements and conditions herein contained which on the part of the purchaser are to be made, done and performed, has this day sold and delivered, but upon the conditions hereinafter recited to the purchaser one Gramm-Bernstein motor truck No. 153,550, model W3½ (hereinafter called the 'car') for four thousand and two hundred and ninety-seven and 35/100 dollars ($4,297.35) and two hundred and fifty-seven and 84/100 dollars insurance ($257.84) paid or to be paid by the purchaser to the seller, or order, thirteen hundred thirty-two and 18/100 dollars ($1,332.18) upon the execution of this agreement and the balance three thousand and two hun-

dred and twenty-three dollars ($3,223.01) in installments
as follows:

> "$402.87 on July 10. 1918.
> "$402.87 on July 10, 1918.
> "$402.87 on Aug. 10, 1918.
> "$402.87 on Sept. 10, 1918.
> "$402.87 on Oct. 10, 1918.
> "$402.88 on Nov. 10, 1918.
> "$402.89 on Dec. 10, 1918.
> "$402.89 on Jan. 10.. 1919.

"Which installments of purchase price shall bear in-
terest at the rate of six per cent, per annum from date
and are to be evidenced by promissory notes made by the
purchaser to the order of the seller, bearing date hereof
and maturing on the due dates of said respective install-
ments.

"The car is subject only to manufacturer's warranty,
if copy of such warranty is annexed hereto; and if so an-
nexed, purchaser buys car as it stands, and no warranty
or representation as to the car or any of its equipment is
otherwise made or given by seller.

"The conditions of this agreement are, that delivery
of the car to seller to purchaser does not pass title hereto,
but both the car and the title thereto shall not pass by
such party of the seller and assigns (and any extension
or assignment of said notes shall not waive this or any
other condition herein contained) until said notes evidenc-
ing said installments of purchase price are paid in full."

After reading the whole of the contract we are per-
suaded that the defendants, who are colored laborers,
could not have read and understood its terms and meaning
had they studied it thirty days. We are also sure that
plaintiff could have sent one of his bright, capable sales-
men or collectors to these colored men and obtained $1,-
000.00 in notes as late as December and this belief is in-
duced by a careful reading of the evidence given by de-
fendants. These colored men could not even tell,
without assistance, the amount which they agreed
to pay for the truck, nor all the payments made
thereon, but they could produce the writing pre-
pared and signed by the plaintiff showing that
they owed him on May 1, 1918, only $3,223.01, and it
is agreed by plaintiff that all the purchase price has been
·paid by them, as per the contract of that date, except

about $700.00 which Reynolds Brothers admit and offer to pay, the two notes in controversy bearing date May 1, 1918. For the plaintiff, Mr. Philmon, a young man of good character no doubt, agent of the plaintiff and residing in Ohio, testified in substance that he made the adjustment and contract between his employer Moody and Reynolds Brothers on May 1, 1918; that he made collections nearly every day and did not remember how much he collected or what notes he received. He further said he engaged Mr. Hanberry at Eddyville, a lawyer and justice of the peace, to assist him in making the settlement. He also remembered that the Reynolds Brothers had some county warrants which they used in making payment on the truck but he did not remember the amount paid to him on this occasion. He added that he reported the settlement to the plaintiff's office in Ohio. He is the only witness for the plaintiff who actually knew the facts about the making of the contract and notes and he does not contradict the evidence for the defendants on this point.

The plaintiff Moody also testified stating that the amount claimed is only $1,077.21, which is an admission by plaintiff of the payment of two notes of $50.00 each, given by Reynolds Brothers in December, 1918. He admits that he only knew what his books show about the transaction and the things he had been told by his agents. However, in his deposition, given on interrogatories, he says:

"On February 14, 1918, when the order was given a deposit of $455.52 was made by Reynolds Brothers, and on March 20, they paid $44.48 making a total of $500.00 paid by them prior to the dleivery of the truck. On March 20, when they paid the $44.48 and took delivery of the truck they gave a settlement totaling $4,055.19. This settlement was not in such form as we could use and was not approved by me.

"Mr. R. C. Stoll and Mr. O. W. L. Coffin both called upon Reynolds Bros., but an acceptable settlement was never received for this truck until May 1, when I sent Mr. R. S. Philmon to Eddyville, Ky., to get additional cash payment and a set of notes, which would be negotiable.

"Mr. Philmon returned to my office in Akron with $300.00 payment, eleven notes of $268.58 each and one

note of $268.63 and two notes of $250.00 each. These fourteen notes were all dated May 1, 1918, and the first twelve notes were protected by a conditional sale agreement signed by Ed. Reynolds, Will Reynolds. Mr. Philmon explained at the time that it was impossible for him to collect additional cash from Reynolds Bros., and that he had accepted the two $250.00 notes in view of such payment. The settlement was made in this manner because we intended to sell the regular series of notes to Bankers Commercial Security Corporation and they were only willing to take notes amounting to 75% of the price of the truck and war tax.

"The price of the truck to Reynolds Bros., was $4,-171.50 and the war tax $125.85, totaling $4,297.35. The regular series of twelve notes which was given to Mr. Philmon was $3,223.01 or 75% of the price of the truck and war tax.

"The total amount of cash which we should have received was 25% of $4,297.35 or $1,074.34 and insurance and handling charges $257.84, making a total amount of $1,332.18. When Mr. Philmon returned to our office after his visit to Eddyville on May 1, 1918, he advised me that Reynolds Bros. did not have $831.18 with which to meet the balance of the cash payment, and on account of some minor trouble they had with the truck, he made them an allowance of $32.18 and $250.00 notes, which were dated May 1, 1918, and fell due February 10, and March 10, 1919, respectively.

"In September, 1918, we purchased some Firestone tires for Reynolds Bros., and in order to help them out we allowed these to go in on their repair account. We also paid for them the regular bankers' notes, which fell due November 10, 1918. On December 18, 1918, we made up a summary of their account which was as follows:

| | |
|---|---:|
| Note 5/1/18, due 2/10/19 | $250.00 |
| Note 5/1/18, due 3/10/19 | 250.00 |
| Interest to 12/18/18 | 19.25 |
| Open account | 375.80 |
| Interest from 11/1/18, 12/18/18 | 2.94 |
| Note 5/1/18, 11/10/18 | 258.58 |
| Interest to 12/18/18 | 10.34 |
| Revenue stamps on new notes | .30 |

$1,177.21

"We sent them notes and a conditional sale agreement, which they signed and returned to us, the notes being as follows:

| | | |
|---|---|---|
| Note 12/18/18, due 1/25/19 | | $50.00 |
| Note 12/18/18, due 2/25/19 | | 50.00 |
| Note 12/18/18, due 3/25/19 | | 100.00 |
| Note 12/18/18, due 4/25/19 | | 250.00 |
| Note 12/18/18, due 5/25/19 | | 250.00 |
| Note 12/18/18, due 6/25/19 | | 250.00 |
| Note 12/18/18, due 7/25/19 | | 227.21 |
| | | $1,177.21 |

"Upon presentation they paid the note due January 25, 1919, for $50.00 and the note due February 25, 1919, for $50.00, but they paid none of the later notes which are shown at the beginning of this answer in making up indebtedness on which suit is being brought."

He admits that he was not present at the time of making the contract or the making of any of the payments which reduced almost all of his material statements to mere hearsay.

The foregoing is the substance of all the evidence offered by appellee Moody.

To illustrate how poorly the defendants, colored men, understood the transaction we copy some of the evidence of Will Reynolds, who testified first:

"Q. Was that purchase made by you alone or with others? A. Me and Will, by brother Will Reynolds. Q. What was the contract price of the truck at the time you bought it. A. Five hundred, no, four hundred and some dollars—no, four thousand dollars or fifty-five hundred dollars. Q. Examine this paper I hand you and state what it is? A. You mean state the amount? Q. State what the paper is? A. A sale agreement. . . . Q. To refresh your recollection as to the contract price, examine that paper and state what it shows to be the total purchase price for the truck? A. The total purchase price was $4,-555.19. Q. Then you were correct when you said the purchase price was $5,500.00? A. No, sir, I was wrong. Q. What was the date of the contract when you made your purchase the first agreement to buy the truck? A. It was in April, wasn't it, Will? No, it was in March. Q. Where was the contract made? A. At Lima, Ohio."

In contradiction of the testimony of Moody that he had only received a cash payment of $300.00 through the Philmon settlement, made May 1, 1918, Will Reynolds says:

"Q. Tell how you paid this other $800.00, give the particulars? A. Well, we paid it through liberty bonds and we paid part through road bonds and partly by check. The road bonds were exchanged for cash. Q. How much cash did you get for the road bonds? A. $500.00, if I mistake not. Q. How much of that $500.00, if any, did you apply on the payment of this truck? A. I applied it all. Q. Where was that done? A. At Eddyville, in Mr. Hanberry's office. . . . Q. When you made the second and thrid contracts and sets of notes, did the company or its agents surrender to you all the notes that you had executed theretofore? A. No, sir."

To prove that plaintiff did not surrender the old notes when he took the new ones, Reynolds produced the following letter:

"August 10th, 1918.

"Office of C. W. Moody,
     Akron, Ohio.
"Subject: Reynolds Bros.
Attention: Mr. Philmon.

"Dear Sir:

"The notes referred to in your letter of August 5th, were destroyed by me in the presence of Ed. Reynolds and some of his brothers, when I made out the second set at Eddyville.

"I am very sure that my corrsepondence will show that after these notes were turned over to me by Mr. R. C. Stoll, I took them to Eddyville and destroyed them.

"Yours very truly,

"O. W. L. Coffin. ·

"Q. How do you know? What is your idea about it, tell about it? A. My idea was they was not destroyed. Q. Why do you say they were not destroyed? A. Because we have got two of them since. Q. How did you get those two? A. Through a change of contract. Q. What's the size of these two notes. A. $150.00, no $250.00 each."

Ed Reynolds also testifies: He says that he was present in Hanberry's office at the time the settlement was made in May, and was asked what that contract covered, to which he answered: It covered the entire indebtedness.

on the truck at that time and everything that was owing. Further testifying he said: "Q. And did they surrender to you then, or to your brother any notes or receipts or anything on account of what was executed by you on December 18, 1918? Had you ever heard of these notes for $250.00 each up to that time? A. No, sir. . . . Q. Were these notes that you executed in December, 1918, for $1,177.00 executed for any other purpose than to cover the open account for tires that you just referred to, to cover as much of the $268.00 notes as the amount would cover? Were they executed for any other purpose except that? A. No, sir, that was my understanding."

T. T. Hanberry, a lawyer, to whom Philmon referred in his deposition, and in whose office and presence the contract of May 1, 1918, was made, testified for defendants in part as follows:

"Q. Mr. Hanberry, did Ed. Reynolds and Will Reynolds, either of them, ever have a transaction in your office with the agent of the Gramm-Bernstein Motor Truck Company relative to the purchase of a motor truck, and the execution of a mortgage or sale contract and set of notes for the purchase of the truck? A. They did. Q. When did that take place? A. It was the second transaction that took place in my office in 1918, and one through an agent by the name of Kaufman and the other, the last one, through the agent of the name of Philmon or some such name as that. The contract that Kaufman had was finished before they came to my office, that is practically so, by the other was drawn in my office—the last one. Q. Do you remember the date of the last one that you referred to, at what time this transaction took place in your office. A. Do you mean the latter one? Q. Yes. A. Along in the summer, I don't remember the month and day, but it was very hot weather, and I remember distinctly they dated it back to May 1, 1918; it was to cover the first contract made with Kaufman or to take the place of that contract. Q. This latter part you refer to, you say that was fixed up for Mr. Philmon? A. Mr. Philmon, that is the one. Q. Do you remember what date it was they came to your office with the other contract—the earlier one? A. I don't remember the exact time; it was considerably earlier in the year 1918; don't remember the month, probably it was May 1st, the papers were dated May 1st, probably that is the exact date. . . . Q. Tell as near as you can what took place at the time the second contract was fixed between Philmon and the Reynolds boys?

A. Well, they made out the contract and the Reynolds boys all signed it and executed 12 promissory notes payable at stated times; I don't remember the dates of payment, and there was also a payment made to Mr. Philmon at that time in cash, but I don't remember the exact amount; the reason I remember so well about the cash payment is that the Reynolds boys had some road bonds against the county of Lyon and Mr. Philmon would not accept them, and the Reynolds boys were forced to discount them at the bank in order to pay him the cash, but as to the exact amount I don't know. . . . Q. Have you any knowledge or was anything said there at that time to apprise you what was the reason for fixing up this last contract that was fixed up at your office, or what was the purpose of it? A. My understanding was that the contract that they had heretofore entered into and executed their notes, that the payments were too large, and the purpose of the second contract was to reduce the payments and the amount of the notes to give them more time, so that it would be easier on them to pay; if I remember, the first notes covered by the first contract were over $400.00 each, and the second notes that were issued were smaller for $268.00 or $270.00. Q. Did you examine this last contract you refer to, the one that was prepared in your office, the notes executed? A. Yes, sir, I did. Q. On behalf of Reynolds Brothers? A. I did. Q. Have you any knowledge or did you at that time, as to whether or not these 12 notes were for $268.00 and some cents each, I mean the last set of notes you referred to covered the entire balance of indebtedness of the Reynolds boys for this truck? Was there any understanding or anything said about that at the time? A. The last set of notes that I refer to was to cover and be in lieu of all prior obligations in the purchase of the truck and all outstanding obligations were to be surrendered, and the agent said at that time that because the prior notes were based on the first contract were hypothecated through different banks, and that as soon as they could be collected they would be surrendered to the Reynolds Bros. Q. Be collected—do you mean paid or gathered? A. Gathered together was my understanding. Q. Do you know, or did you know at that time, how much cash Reynolds Bros. had paid on the truck, including the payment that they made there at your office? A. $1,332.18 I think is the exact amount that had been paid up to the execution of the sec-

ond contract, the balance covered by the 12 promissory notes. You will find the amount paid up to that time specified in the contract. . . . Q. Can you state whether or not the contract that you just testified about and that you are now looking at, correctly represented the state of the transaction at that time and the amount of the indebtedness that was still owing and the amount that had been paid in cash? A. It shows the amount that had been paid and for which Reynolds Bros. were credited, the amount of $1,332.18 and the balance of that was yet due and represented by the 12 promissory notes of $3,-223.01, it was covered by 12 promissory notes running from June 10, 1918, to May, 1919. Q. What was the denomination of those notes? A. $268.58 except the last one which is for $268.63. Q. And the 12 notes aggregate $3,-223.01? A. Yes, sir, $3,223.01 which represented the total indebtedness at that time of the Reynolds Bros. to this company as I understood. Q. Mr. Hanberry, was there anything said there at that time, or did you ever have knowledge of any claims upon the part of the truck company or its agents, that Reynolds Bros. had executed two notes of $250.00 each in lieu of $500.00 that was credited to them as a cash payment? Did you ever hear anything of that sort or was any mention made as to that at that time? A. I don't recall to mind anything that was said about it? Q. Did you ever hear anything of that sort before? A. I never did. The contract was supposed to show the complete transaction betwen the parties and the company. Q. And to show it correctly? A. Yes, and to take care of prior trades and contracts and obligations that had heretofore been entered into by the parties, and there was no question that the contract did not clearly show the situation? A. No, sir, no question about it.''

From the evidence quoted it will be seen that the defendants have the greater weight. The trial court should therefore have found for the defendants and not the plaintiff.

The briefs are short on both sides. Appellee insists that great weight should be given to the opinion and judgment of the chancellor, and this is our unbroken rule, when he is sustained by the evidence; but when his finding is at variance with the evidence, as in this case, we try the facts and accord to them such weight as they in good conscience should receive and no more. Nor are we impressed with the importance of the repeated statement by

counsel for appellee that the defendants are "muddy-headed negroes" and their evidence disconnected and vague, for they were plain, uneducated colored people, forced to labor every day to make their required payments on this unusually high priced Gramm-Bernstein motor truck, and did not have either the time, education nor capacity to understand the long drawn out and complicated contract which they were required to execute. They were, as shown by the evidence, absolutely at the mercy of the plaintiff and his agents.

Appellee says that this was not properly an equitable action and, therefore, the finding of the court should be given the weight accorded the verdict of a properly instructed jury. About this he is mistaken, and should gracefully admit his error for he brought his cause on the equity side of the docket and prayed the enforcement of a lien and other equitable relief. But be that as it may, the facts here disclosed would overturn a verdict of a jury.

The two notes of $250.00 each were, according to the great weight of the evidence, not proper charges against appellants, Reynolds Brothers, at the time of the institution of this proceeding, and the trial court should have so found.

On a return of the case the court will enter a judgment in favor of plaintiff for the balance, if any, of the account with interest, as shown by the December settlement.

Judgment reversed for proceedings consistent with this opinion.

Whole court sitting.